STATE of Missouri,
Plaintiff-Respondent,

v.

Donald Patrick SHIPMAN,
Defendant-Appellant.

No. 10799.

Missouri Court of Appeals,
Springfield District.

July 13, 1978.

948

John D. Ashcroft, Atty. Gen., Gregory W. Schroeder, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

James R. Reynolds, Ford, Ford, Crow & Reynolds, Kennett, for defendant-appellant.

Before BILLINGS, C. J., and HOGAN and TITUS, JJ.

TITUS, Judge.

Tried as a second offender and found guilty by a jury of attempted burglary (Count I) and possession of burglary tools (Count II), defendant was court-sentenced to concurrent prison terms of five years on Count I and ten years on Count II.

Near 2:30 a.m. on April 16, 1977, a Hornersville policeman found and arrested 23-year-old defendant as he was prying on the alley door of a grocery store. Defendant, a self-proclaimed "drug addict," admitted the crime but testified he thought he was trying to get into the next-door drugstore "to steal drugs."

Defendant's mother, a registered nurse, testified, in substance: When defendant was in high school he was "a bright young man" with "a relatively high I.Q." Defendant "related well to his peers, got along well with his brothers and sisters and was relatively obedient to his parents." However, when defendant was in the army in 1972 his "demeanor" changed. He went AWOL, looked "rather dirty . . . was nervous [and] very unresponsive to his parents." Subsequent to receiving an undesirable discharge from the army, defendant's mother discovered he was using "drugs or narcotics." He could not keep a job, was convicted of a drug-related check charge and spent about 18 months in the penitentiary. Before going to prison, defendant would at times be "elusive and articulate. Other times he would be withdrawn and to himself, and he would maybe sit down and nod off to sleep and when I would try to awaken him, he would shrug me off. When I tried to discuss this with [him] he would be very abusive with me." Defendant's condition was "worse" after he left the penitentiary and this continued up until three days before the crimes were committed which was the last time defendant's mother saw him prior to April 16, 1977.

The core of the appeal concerns three questions asked of defendant's mother after counsel had elicited from her on direct examination the foregoing background infor-

mation. Sustention of the state's objection to each question and the refusal of defendant's offers thereto, constitute the principal claims of trial court errors by defendant. The questions were: (1) " . . . based upon the association that you had with your own son and the observations that you have described over some five year period, do you have an opinion not only as a qualified nurse but as a mother as to whether on April 16th of '77, when he committed these acts, that he was of sound mind?" (2) "Do you have an opinion, based upon your observations and the experience you had with [defendant] over these periods of years, both as his mother and as a nurse, whether on April 16, 1977, in your lay opinion, he could be responsible for his acts?" (3) " . . . do you have any opinion, based upon the things we've gone through as to whether [defendant], on April 16th, knew right from wrong?"

. Albeit § 552.010[1] is entitled "Definition of mental disease or defect," it does not, in fact, define the terms more than to state that " 'mental disease or defect' include congenital and traumatic mental conditions as well as disease." Also without specificity, MAI–CR 2.32 instructs that "The phrase 'mental disease or defect', . . . , means any mental abnormality, regardless of its medical label, origin or source." Without much more than embraced in the direct definition of terms, § 552.010 and MAI–CR 2.32 additionally refine and charge that the terms " 'mental disease or defect' do not include . . . drug abuse without psychosis." Thus, while the statute seemingly adopts a liberalized view of mental illness (See, "An Analysis of the Law," Richardson, Reardon and Simeone, Vol. 19 No. 12, Journal of the Missouri Bar, p. 677 etc.), it retains the pre-statute conservatism when

dealing with drug abuse because it makes psychosis the determinative factor in deciding whether drug abuse is a defense vel non. *Boyer v. State*, 527 S.W.2d 432, 437[8] (Mo.App.1975).

An acute or temporary state of drug intoxication is not the equivalent of a drug addiction or abuse which is chronic. Cf. *State v. Street*, 498 S.W.2d 523, 524[2, 3] (Mo.1973). But although the condition suffered be chronic, it does not rise to a recognizable defense under the law unless it has resulted in psychosis. Consequently, the basic issue in this case concerns defendant's legal responsibility for his undisputed criminal act, and, assuming submissibility of the issue, the matter which the jury would have had to determine was whether the defendant, at the time of the crime and as the result of drug-induced psychosis, did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law. § 552.030; MAI–CR 2.33; *Franklin v. State*, 455 S.W.2d 479, 484[5] (Mo.1970); *Boyer v. State*, supra, 527 S.W.2d at 436[3].

"Psychosis" and "insanity" are synonymous (Webster's Third New International Dictionary of the English Language, Unabridged, pp. 1168 and 1833; Webster's New World Dictionary of the American Language, Col. ed., pp. 755 and 1176; 73 C.J.S. Psychosis, p. 274), and "insanity" is to be equated to the incapacity of distinguishing right from wrong. *State v. Crayton*, 354 S.W.2d 834, 836 (Mo.1962); 44 C.J.S. Insane Persons § 2(2), p. 11.[2] The right-wrong insanity test attributed to *M'Naghten* Case, 1 C. & K. 130, 10 CL. & F. 200, 8 Eng.Rep. 718 (1843), has been applied to defenses of drug addiction in like manner as

---

1. References to statutes are to RSMo 1969, V.A.M.S. "MAI–CR" references are to Missouri Approved Instructions-Criminal.

2. "From a medical standpoint, one may be insane by reason of mental disease or mania, yet, from a legal aspect, not unless or until his

mental condition has reached the point where he is unable to distinguish right from wrong and to know the nature and consequences of his acts is he exonerated . . . ." *McGee v. State*, 155 Tex.Cr.R. 639, 238 S.W.2d 707, 710[1] (1951).

applied to insanity resulting from other causes. *State v. Crayton,* supra; 73 A.L. R.3d 16, Drug Addiction as Defense, § 13, p. 71 etc. While it must be recognized that drug addiction without psychosis is not a defense [§ 552.010; *United States v. Freeman,* 357 F.2d 606, 625[8–11] (2d Cir. 1966)], a mental disease or defect which results in insanity or the inability to distinguish right from wrong is still a defense although the disease or defect had its origin and was nurtured into legal irresponsibility through drug abuse or addiction. Stated differently: If a psychosis exists by reason of defendant's inability to tell right from wrong or inability to know or appreciate the nature, quality or wrongfulness of his conduct or incapacity to conform his conduct to the requirements of law (§ 552.030), how or why the mental disease or defect arose should be of no moment. See, *State v. Morris,* 263 Mo. 339, 348, 172 S.W. 603, 605[2] (1915); *State v. Porter,* 213 Mo. 43, 57, 111 S.W. 529, 531–532, 127 Am.St.R. 589 (1908); *State v. Riley,* 100 Mo. 493, 499, 13 S.W. 1063, 1064 (1890); 21 Am.Jur.2d, Criminal Law, § 43, p. 128.

While we eschew the unnecessary chore in this case of deciding the propriety of counsel's first two questions to defendant's mother seeking her opinion as to whether defendant "was of sound mind" or "could be responsible for his acts," there is no disputing that a lay witness, employing the M'Naghten right-wrong test, may express an opinion as to the insanity of a human being provided he first testifies as to the unusual, abnormal or bizarre conduct observed so that it may be determined whether the abnormalities shown justify the opinion. *State v. Edmonds,* 468 S.W.2d 685, 688[8] (Mo.App.1971); *United States v. Milne,* 487 F.2d 1232, 1235[9] (5th Cir. 1973); VII Wigmore on Evidence, 3rd ed., § 1938, p. 36; 31 Am.Jur.2d, Expert and Opinion Evidence, § 88, pp. 604–606. "It is general-

ly conceded that no helpful rule can be formulated declaring what minimum knowledge will qualify a witness to express an opinion on the insanity of a person; and that the determination of that question in each case must be confided largely to the discretion of the trial court, with which appellate courts do not interfere unless the ruling was clearly erroneous. . . . 'The truth is that the test should be left in the hands of the trial judge. Neither its exact phrasing nor its application in a given instance, should be made to occupy the time of the highest Courts.'" *State v. Jackson,* 346 Mo. 474, 481, 142 S.W.2d 45, 49[5, 6] (1940); 3 Wigmore on Evidence, Chadbourn Revision, § 689(2), p. 12.

The testimony of defendant's mother which preceded the questions seeking her opinions, evidenced, at most, a recasting of defendant's unconventional conduct when he was under the influence of drugs. It is difficult to comprehend how such an accounting would warrant a lay conclusion that defendant's drug abuse had resulted in psychosis or in the inability to distinguish right from wrong.[3] Ergo, we conclude the trial court did not abuse its discretion in excluding the mother's opinion testimony. Moreover, if counsel, because the mother was a nurse, was endeavoring to elicit her opinions as an expert, rather than as a nonexpert, we perceive no abuse of discretion on the part of the court. The mother's training and experience in dealing with mental diseases were admittedly limited and she did not lay claim to any expertise in diagnosing or determining mental capacity for the purpose of criminal responsibility. *State v. Williams,* 515 S.W.2d 463, 466[3 and 4] (Mo.1974).

To augment the foregoing, there is another reason why we may not short the trial court for refusing to permit the defendant's mother to express her at-time-of-

3. Our jurisdiction requires, from the lay witness, testimony of facts inconsistent with a sound mind prior to delivery of opinion on

mental condition. *Machens v. Machens,* 263 S.W.2d 724, 730[5] [6] (Mo.1953).

trial opinions. A lay witness may give an opinion regarding the sanity or insanity of a defendant *if it be an opinion formed at the time the witness observed the facts which induced the opinion.* "It is the impression made upon his mind at the time that is important. An opinion conceived at a later date is not the impression received at the time, from facts immediately observed then, but from later and riper knowledge. To say that a lay witness may afterwards, on mature reflection, possibly with expert advice as to the matter, and an analysis of the facts as he has considered them from later experience, express an opinion, puts him in the class of expert instead of nonexpert witnesses." *State v. Douglas,* 312 Mo. 373, 399–400, 278 S.W. 1016, 1024[14] (1925). "The rule seems to be well established that a nonexpert witness may delineate his observation of an accused, his attitude, both mental and physical, as compared to his previous attitude, etc., and draw his general conclusion or opinion therefrom, but nowhere have we been able to find any opinion that would allow such nonexpert to say what such opinion would be at a future time such as at the commission of the offense, if such be at a different time from his observation. To allow such an opinion would invade the realm of experts who, from their knowledge, study, and long experience, could therefrom fix a prognosis of such diseased condition of the mind and prophesy its future probable outcome." *Ross v. State,* 153 Tex.Cr.R. 312, 220 S.W.2d 137, 147[16] (1948), rehearing denied (1949); *Fuller v. State,* 423 S.W.2d 924, 929[14] (Tex.Cr.App. 1968).

■ Another point on appeal relied on by defendant is that the trial court erred in failing to give certain instructions on the defense of mental disease or defect excluding responsibility. However, § 552.030(7) provides that persons are presumed to be free of such mental disease or defect and that determination of that issue is one for the jury only upon the introduction of sub-

stantial evidence of lack of such responsibility. *State v. Vansandts,* 540 S.W.2d 192, 205[20] (Mo.App.1976). As we have held that the trial court did not err in excluding the proffered opinion testimony of defendant's mother, there was no proof of the purported defense and, hence, no requirement that instructions be submitted on the subject. *State v. Bacon,* 501 S.W.2d 499, 501[2] (Mo.App.1973).

A third point relied on concerns the amended information. As initially filed, the pleading commenced with an averment of defendant's prior felony conviction. This recitation, made in conformity with § 556.-280, terminated with a semicolon and was followed by allegations which charged defendant with attempted burglary. Following this charge, which ended without punctuation, appeared "Count II" and recitations amounting to a charge of unlawful possession of burglary tools. Upon permitting the filing of the amended information, the court also allowed the insertion of "Count I" following the semicolon which ended the allegations relative to defendant's prior felony conviction. Defendant says the trial court erred in sentencing defendant as a second offender on each charge for two reasons: First, before the insertion of "Count I", the information charged defendant under the second offender statute only as to the attempted burglary charge. Second, the insertion of "Count I" served to render the habitual criminal allegations inapplicable to either count of the amended information.

*McCormick v. State* is thrice reported in 256 Ind. 78, 267 N.E.2d 78 (1971); 262 Ind. 303, 315 N.E.2d 360 (1974); and 262 Ind. 303, 317 N.E.2d 428 (1974). A combined reading of these opinions discloses that defendant was found guilty of rape as charged under Count I, and of assault and battery with intent to gratify sexual desires, and as being an habitual criminal as charged under Count II. In 315 N.E.2d 360, involving defendant's petition for postconviction relief, the state conceded and the

court found it was error for defendant to have been convicted of assault and battery as charged in Count II because it was a lesser included offense in the charge of rape. Upon defendant's petition for rehearing (317 N.E.2d 428), defendant contended that as the habitual criminal charge was coupled with the assault and battery charge under Count II, and as the assault and battery conviction had been vacated, it was improper to sentence him as an habitual criminal on the rape charge of which he had been convicted. The Supreme Court of Indiana rejected this contention as we likewise reject defendant's similar contention on this appeal.

An amended information which simply invokes the second offender act without changing the originally charged offense or offenses, does not serve to charge offenses different from those charged in the original information. *State v. Lockhart*, 501 S.W.2d 163, 165 (Mo.1973). The second offender act does not work in terms of a prior conviction being joined or coupled with new charges. Our statute, § 556.280, provides for an inquiry by the trial court out of the hearing of the jury as to whether or not the defendant has been previously convicted, sentenced, fined or imprisoned for a felony. If the trial judge makes an affirmative finding, the jury then only determines the innocence or guilt of the defendant on the charge or charges contained in the information. "Proof of the prior conviction is not a substantive part of an offense subsequently committed, and any conviction must be for the offense [or offenses] charged in the information." *State v. Pfeifer*, 544 S.W.2d 317, 319 (Mo.App. 1976). The prior conviction allegations need not be set out in any particular order or form [*McCormick v. State*, supra, 317 N.E.2d at 429] and the amended information in this case clearly apprised defendant that he was charged as an habitual criminal with the commission of two felonies.

Defendant's penultimate and last points relied on will be considered together. They have this factual background. At the time the policeman found defendant prying on the back door of the grocery store with a crowbar, there was lying nearby a bolt cutter and a large screwdriver. The policeman arrested defendant and took him to jail leaving the tools in the alley. A deputy sheriff was summoned by radio. He arrived promptly. After being given the *"Miranda Warning"*, defendant was returned to the alley behind the grocery by the deputy and policeman. About 20 to 30 minutes had elapsed between the time defendant was discovered prying on the rear door of the grocery and the time he was returned to the scene. The deputy took possession of the tools and they were offered and received as state's exhibits at trial. The policeman testified, variously, that upon the return trip to the alley "the same tools [were] still there by the door," that the bolt cutter exhibit "look[ed] like one of the tools . . . that was there," that the crowbar exhibit was "the one [defendant] laid down" in the alley when arrested and that the screwdriver exhibit "looks like" the tool he observed in the alley. The deputy testified the three tool exhibits were the ones "I picked up behind Raul's Grocery Store on the morning of the 16th" and had been in his possession constantly until trial time. Also, the deputy testified that a few days prior to trial, he returned to the alley with the three tools, placed them, the best he could recall, in the "approximate location" they were when first found and had a photograph made of the scene as reconstructed. Defendant's present objections to the reception in evidence of the tools and photographs are that the tools were not properly identified and that the photograph was not shown to be a fair and accurate representation.

Identification of exhibits need not be wholly unqualified in order to make them admissible into evidence. Any qualification as to the identity of exhibits, if otherwise admissible, is for the jury to weigh. *State v. Stancliff*, 467 S.W.2d 26,

**954**

30[2] (Mo.1971). Testimony that an exhibit "looks like", "looks familiar", "looked like", looked " 'very much' " like, looked " 'very similar' ", and " 'was a gun like' " has been held sufficient to permit the exhibits' introduction into evidence.[4] *State v. Kern*, 447 S.W.2d 571, 574–575[3] (Mo.1969), reversed on other grounds, *Kern v. State*, 507 S.W.2d 8 (Mo. banc 1974); *State v. Johnson*, 286 S.W.2d 787, 791[3] (Mo.1956); *State v. Gonzales*, 533 S.W.2d 268, 274[13] (Mo.App. 1976); *State v. Alderman*, 498 S.W.2d 69, 72[5] (Mo.App.1973).

"Photographs of the scene of an alleged crime are admissible in evidence at a criminal trial if they depict the conditions and circumstances surrounding the alleged crime and aid the jury in throwing light on a material issue in the case. The admissibility of photographs of a scene is a matter resting primarily within the discretion of the trial court. . . . The test is whether the photographic evidence shows relevant facts which will aid the jury. . . . The essential factor whether a photograph is admissible depends upon whether the photograph represents the observation of the witness. The accuracy of the photograph may be proved by anyone who knows the facts. Photographs are admissible when the witness shows that they are a reasonably accurate representation of the place or thing in question in order to aid the jury in understanding the testimony of the witness. The fact that a photograph may be incorrect in certain particulars or that there are changes in the scene does not affect the admissibility of the photograph but only affects the weight to be given to it by the jury." *State v. Rogers*, 523 S.W.2d 344, 347[1–7] (Mo.App.1975).

Judgment affirmed.

All concur.

---

4. Moreover, the trial court's decision as to the admissibility of the exhibits is bolstered by defendant's in-court recognition of the bolt cutter and crowbar as those he had previously obtained from "a man up at Holcomb" and had with him at the time of the attempted break-in.